**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| **NORTH CAROLINIANS FOR PRIVACY**, an unincorporated nonprofit association;<br><br>    Plaintiff,<br><br>    vs.<br><br>**UNITED STATES DEPARTMENT OF JUSTICE**; **LORETTA E. LYNCH,** in her official capacity as United States Attorney General; **UNITED STATES DEPARTMENT OF EDUCATION**; and **JOHN B. KING, JR.,** in his official capacity as United States Secretary of Education.<br><br>    Defendants. | |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

North Carolinians for Privacy states as follows:

# INTRODUCTION

1.      The Plaintiff, North Carolinians for Privacy, brings this declaratory action pursuant to 28 U.S.C.A. §§ 2201-02 on behalf of its members, who are students in the University of North Carolina University System; students at elementary, middle, and high schools throughout North Carolina; and parents of the students who are minor children.

2.      North Carolinians for Privacy asks this Court to declare that:

1

a. The Department of Justice and the Department of Education may not lawfully rely on and enforce the Department of Education's redefinition of "sex" in Title IX, because the Department's agency action of redefining "sex" violated the Administrative Procedure Act;

b. The maintenance of sex-specific restrooms and locker rooms by educational institutions does not violate the requirements of Title IX, codified at 20 U.S.C. §§ 1681 et. seq., which prohibits discrimination in education or educational benefits and programs because of a person's "sex;" and

c. The maintenance of sex-specific restrooms and locker rooms by educational institutions does not violate the requirements of the Violence Against Women Act ("VAWA"), codified at 42 U.S.C.A. §§ 13925 et seq., which prohibits discrimination in certain programs and activities in education because of a person's "gender identity."

3.     North Carolinians for Privacy also asks this Court to enjoin the Defendants from taking any action inconsistent with this Court's declaration that would affect its members' rights.

4.     The federal Department of Justice ("DOJ") sent letters to the Governor of North Carolina, as well as the President of the University of North Carolina System, last Wednesday (May 4, 2016), demanding that the State and the

2

University System allow biological males to use restrooms and locker rooms designated for women, and to allow biological females to use restrooms and locker rooms designated for men.

5.    DOJ's letters threatened that, if the State of North Carolina and the University System do not comply, DOJ would invoke its power to enforce Title IX through "'any other means authorized by law,' including judicial enforcement," and to "enforce VAWA through civil actions," and revoke federal funds made available pursuant to Title IX and VAWA.

6.    Yesterday, May 9, 2016, the DOJ filed suit against the State of North Carolina and the University System.

7.    At a press conference announcing the lawsuit, United States Attorney General Loretta Lynch stated that DOJ "retain[ed] the option of curtailing federal funding" for North Carolina and its schools, including the University System.[1]

8.    In response to a question at the press conference, Attorney General Lynch stated that, "It would be premature right now to give a date on when we actually will take that step" of revoking federal funds.[2]

---

[1] Department of Justice, "Remarks as prepared for Delivery," May 9, 2016, *available at* https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-press-conference-announcing-complaint (last visited May 9, 2016).

[2] Jane Stancill, "UNC President Spellings: UNC system caught in middle of state, federal fight on HB2," *The News &Observer*, May 9, 2016, *available at* http://www.newsobserver.com/news/local/education/article76612287.html (last visited May 9, 2016).

3

9.     The University System's spokesperson has publicly stated that the University System's federal funds, including its students' eligibility for student loans, are at stake.[3]

10.     The total amount of federal funds at stake is approximately $1.4 billion, while the total amount of federal student loans that the University System's students will lose is approximately $800 million.[4]

11.     Some of the members of North Carolinians for Privacy are students currently within the University System, or will be students within the University System beginning next year.

12.     All of these students' educational opportunities will be adversely impacted if the federal government revokes the federal funding that the University System receives.

13.     Additionally, some of these students receive currently Pell Grants, federal student loans, or other sources of federal funding, all of which is now at risk.

14.     These students' current and future educational opportunities, as well as their financial ability to secure an education at colleges within the University System, will be directly impacted if the federal government determines that the

---

[3] Emery P. Dalesio, "NC college system's federal funds in crosshairs of LGBT law," *CTPost*, May 8, 2016, *available at* http://www.ctpost.com/news/politics/article/North-Carolina-leaders-denounce-federal-threat-on-7394507.php (last visited May 8, 2016).

[4] Pete Williams et al., "DOJ Files Lawsuit Challenging North Carolina Bathroom Law," *NBC News*, May 9, 2016, *available at* http://www.nbcnews.com/news/us-news/north-carolina-gov-pat-mccrory-faces-monday-deadline-lgbt-law-n570396 (last visited May 9, 2016).

4

University System is in violation of Title IX, and so makes those students ineligible to receive this federal financial assistance while attending the University System.

15.     Also included within North Carolinians for Privacy are elementary and secondary school students and their parents.

16.     Their schools are public schools in North Carolina that receive federal funding pursuant to Title IX.

17.     They are aware that the federal government has previously threatened to revoke federal funding when public school districts sought to maintain sex-specific restrooms and locker rooms.

18.     DOJ's letter to the Governor indicates that DOJ requires their public elementary and secondary schools to allow biological male students entry and use of the restrooms and locker rooms designated for females, and also to allow biological female students entry and use of the restrooms and locker rooms designated for males.

19.     DOJ is threatening to revoke Plaintiff's members' schools' federal funding pursuant to Title IX if the State does not require its public schools to grant such rights of entry and use.

20.     Their educational opportunities will be adversely impacted if the federal government revokes their schools' federal funding.

21.     In its letters to the State and the University System, DOJ relied on a new rule, created by the Department of Education ("DOE"), that forbids educational institutions from maintaining sex-specific restrooms and locker rooms.

5

22.     DOJ also stated that Title IX and VAWA forbid sex-specific restrooms and locker rooms in educational institutions.

23.     DOE's action in creating its new rule violates the Administrative Procedure Act, codified at 5 U.S.C. §§ 500 et seq., and is unlawful, as is DOJ's reliance on it.

24.     Title IX and VAWA both allow for sex-specific restrooms and locker rooms.

25.     North Carolinians for Privacy therefore seeks a declaration from this Court to that effect, in order to put an immediate end to the ongoing threat to their ability to access educational opportunities at elementary, middle, and high schools throughout North Carolina and at colleges within the University System.

## JURISDICTION AND VENUE

26.     This action arises under 28 U.S.C.A. §§ 2201-02 (the "Declaratory Judgments Act"), 5 U.S.C. §§ 500 et seq. (the "Administrative Procedure Act" or the "APA"), and 20 U.S.C. §§ 1681 et. seq. ("Title IX").

27.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1361, and 1367.

28.     The Court has jurisdiction to issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

29.     The Court has jurisdiction to award the requested injunctive relief under 5 U.S.C. §§ 702 and 703, 20 U.S.C. § 1683, and Federal Rule of Civil Procedure 65.

30.    The Court has jurisdiction to award reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412.

31.    Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and (e), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PLAINTIFF

32.     Plaintiff North Carolinians for Privacy is an unincorporated non-profit association organized under N.C. Gen. Stat. Ann. § 59B-1 through B-15, and headquartered in Raleigh, North Carolina.

33.    North Carolinians for Privacy exists to advocate for, and protect, bodily privacy in the State of North Carolina and to ensure their members need not give up their right to privacy in order to access educational opportunities at elementary, middle, and high schools throughout North Carolina and at colleges within the University System.

34.    Its members have an interest in this litigation because the action of the DOJ threatens bodily privacy rights in North Carolina and their ability to continue to access educational opportunities at elementary, middle, and high schools throughout North Carolina and at colleges within the University System.

35.    North Carolinians for Privacy's members are all United States citizens and residents of the State of North Carolina.

36.    Some of its members are directly impacted by DOJ's actions, which threaten to revoke federal funding if the State and University System do not allow

biological males the right of entry and use of restrooms and locker rooms designated for females, and vice versa.

37.     Some of its members are students within the University of North Carolina System (**the "University Students"**), or will be matriculating next school year as freshmen to colleges within the University System.

38.     Some of its members are students in North Carolina elementary schools, middle schools, or high schools that receive federal funding (**the "Minor Students"**).

39.     Some of its members are parents of Minor Students (**the "Parents"**).

# DEFENDANTS

## *Defendant Department of Justice*

40.     Defendant Department of Justice is an executive agency of the United States government and is responsible for the enforcement of Title IX, 20 U.S.C. §§ 1681-1688, and its implementing regulation at 34 C.F.R. Part 106. DOJ also has authority to bring enforcement actions to enforce Title IX and VAWA.

## *Defendant Attorney General Loretta E. Lynch*

41.     Defendant Loretta E. Lynch is the United States Attorney General. In this capacity, she is responsible for the operation and management of the DOJ. Lynch is sued in her official capacity only.

## *Defendant Department of Education*

42.      Defendant Department of Education is an executive agency of the United States government and is responsible for the promulgation, administration,

8

and enforcement of Title IX, 20 U.S.C. §§ 1681-1688, and its implementing regulation at 34 C.F.R. Part 106.

43.     DOE is responsible for adopting, promulgating, and enforcing its new legislative rule interpreting "sex" in Title IX to mean, or include, gender identity.

### *Defendant Secretary John B. King, Jr.*

44.     Defendant John B. King, Jr., is the United States Secretary of Education. In this capacity, he is responsible for the operation and management of the DOE. King is sued in his official capacity only.

## STATEMENT OF FACTS

### I.  DOJ Relies on DOE'S Unlawful Agency Action And Misunderstandings of VAWA

**A.     Title IX and Its Meaning**

45.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681.

46.     The regulations implementing Title IX provide, in relevant part, that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular…or other education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.31(a).

47.     The implementing regulations also provide that a funding recipient shall not on the basis of sex: "Treat one person differently from another in

9

determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; … Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; … Deny any person any such aid, benefit, or service; … Subject any person to separate or different rules of behavior, sanctions, or other treatment; …[or] Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity." 34 C.F.R. § 106.31(b).

48. Nothing in Title IX's text, structure, legislative history, or accompanying regulations addresses gender identity.

49. The term "gender identity" does not appear in the text of Title IX.

50. The term "gender identity" does not appear in the regulations accompanying Title IX.

51. The term "gender identity" does not appear in the legislative history relating to Title IX.

52. Indeed, recognizing that Title IX does not protect against discrimination because of "gender identity" (but only against discrimination because of biological sex), beginning in 2011, Senator Al Franken has repeatedly introduced legislation modeled after Title IX that would protect against discrimination because of gender identity in the education context, just as Title IX protects against discrimination because of sex.

53. That legislation has failed to pass every year it has been introduced.

Case 1:16-cv-00845-TDS-JEP   Document 1   Filed 05/10/16   Page 10 of 50

54.     Title IX and the accompanying regulations use the term "sex," not "gender identity," in describing the type of discrimination prohibited.

55.     The term "sex" as used in Title IX and its implementing regulations means male and female, under the traditional binary conception of sex consistent with one's birth or biological sex.

56.     Title IX also states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes[,]" 20 U.S.C. § 1686, indicating that Congress intended that Title IX would respect student privacy rights.

57.     Title IX's accompanying regulations confirm that schools "may provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

58.     Preventing the mixing of biological boys and girls in intimate environments like restrooms, locker rooms, and showers is the very reason that Congress allowed for separate living facilities, and that Title IX regulations allow for separate restrooms, locker rooms, and changing areas, for the different sexes.

B.      **DOE's Unlawful Agency Action**

59.     Under the Administrative Procedure Act, any "rules which do not merely interpret existing law or announce tentative policy positions but which establish new policy positions that the agency treats as binding must comply with

the APA's notice-and-comment requirements, regardless of how they initially are labeled." 72 Fed. Reg. 3433.

60.     Such legislative rules enacted under Title IX must also be "approved by the President" before they become effective. 20 U.S.C. § 1682.

61.     DOE took agency action and declared that the term "sex" as used in Title IX's prohibition on sex discrimination now means, or includes, "gender identity."

62.     This agency action constituted the creation of a new legislative rule, because it announced a new policy position, which the agency is treating as binding.

63.     DOE announced this new legislative rule redefining "sex" to schools nationwide in several DOE guidance documents published over the last few years, including the following:  U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, 5 (Apr. 2014); U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities,* 25 (Dec. 2014); U.S. Department of Education, Office for Civil Rights, *Title IX Resource Guide,* 1, 15, 16, 19, 21-22 (Apr. 2015).

64.     DOE's new rule requires educational institutions to treat students consistently with their perceived gender identity, regardless of biological sex.

65.     DOE has enforced its new rule in numerous secondary school districts around the country.

66.    For example, DOE threatened Palatine, Illinois, Township High School District 211 with the loss of $6 million dollars in federal funds if it failed to grant a biologically male student access to the girls' locker and shower rooms.

67.    DOE has treated its declaration that Title IX bars gender identity discrimination as a legislative rule that is binding on all schools that are subject to Title IX.

68.    DOE is actively enforcing this legislative rule against schools across the country.

69.    DOE did not comply with APA's notice-and-comment requirements when it adopted its legislative rule redefining "sex" in Title IX to include gender identity and mandating that schools give students seeking access to opposite sex facilities based on their gender identity the access they desire.

70.    DOE's new rule was not published for notice and comment.

71.    DOE's new rule was not signed by the President.

## C.    DOJ's Improper Reliance on DOE's Unlawful Agency Action

72.    Last week, on Wednesday, May 4, 2016, the federal Department of Justice (DOJ) sent letters to the Governor of the state of North Carolina (**the "Letter to the Governor"**),[5] along with the President of the University of North Carolina System (**the "Letter to the University System"**).[6]

---

[5] Letter, U.S. Department of Justice Civil Rights Division to Governor Pat McCrory, May 4, 2016, *available at* https://assets.documentcloud.org/documents/2823410/-Civil-Rights-Division-letter-on-HB2.pdf; Letter, U.S. Department of Justice Civil Rights Division to Margaret Spellings, President, University of North Carolina, May 4, 2016, *available at* http://www.charlotteobserver.com/news/politics-

73.     Those letters stated that if the State and University System complied with a North Carolina law known as H.B. 2, which requires multiple occupancy bathroom or changing facilities to be designated for the use of only students of one biological sex, the State would violate Title VII, and the University System would violate Titles VII, IX and VAWA.

74.     Those letters also include a demand: stop enforcing H.B. 2 or face imminent enforcement actions, including a revocation of their federal funding.

75.     DOJ's lawsuit, filed against the State and the University System, amplified that demand.

76.     The letters and the lawsuit together create an unmistakable ultimatum: either submit to the will of DOJ by prohibiting sex-specific restrooms and locker rooms in educational institutions, or face the consequences, including revocation of federal funds (**"the Ultimatum"**).

77.     The Letter to the Governor notes in footnote 3 that H.B. 2 applies to local boards of education, thus recognizing that public schools are prohibited by state law from allowing biological males to enter and use private facilities designated for females, and vice versa. Letter to the Governor, *supra* note 5, at 2 n.3.

_____

government/article75647942.ece/BINARY/Read:%20DOJ%20letter%20to%20UNC (last visited May 8, 2016).

[6] Letter, U.S. Department of Justice Civil Rights Division to Margaret Spellings, President, University of North Carolina, May 4, 2016, *available at* http://www.charlotteobserver.com/news/politics-government/article75647942.ece/BINARY/Read:%20DOJ%20letter%20to%20UNC (last visited May 8, 2016).

14

78. The Letter to the Governor states that a similar prohibition, affecting the University of North Carolina System, is a Title IX violation. *Id*. at 2-3.

79. The Letter to the Governor also warns that, according to DOE's guidance, "educational institutions generally must treat [students who perceive themselves as the opposite biological sex] consistent with their gender identity," and that DOE's guidance is "entitled to controlling weight." *Id*. at 1-2 (quotations omitted).

80. The Letter to the University System states that the requirements of Title IX and its implementing regulations prohibit the University System from maintaining sex-specific facilities for either employees or students. Letter to the University System, *supra* note 6, at 2-3.

81. As authority for this statement, DOJ relies upon DOE's new legislative rule declaring that the term "sex" in Title IX and its implementing regulations includes gender identity. *Id*. at 3.

82. DOJ thus relies upon DOE's unlawful agency action to reach its determination that the State and the University System will violate Title IX if they adhere to the requirements of H.B. 2 and continue to maintain sex-specific restrooms, locker rooms, and shower rooms in the State's educational institutions, including the University System.

## D. DOJ's Reliance on a Wrong Understanding of VAWA

83. In the Letter to the University System, DOJ states that VAWA prohibits the University System from discriminating based on gender identity, and

15

intimates that VAWA therefore prohibits maintaining sex-specific restrooms and locker rooms. *Id.* at 2.

84. VAWA requires that no one, based on gender identity, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination *under any program or activity funded in whole or in part with funds made available under the [VAWA].*" 42 U.S.C.A. § 13925(13)(A) (emphasis added).

85. The programs and activities funded under VAWA include, for example, "education programs for the prevention of domestic violence, dating violence, sexual assault, and stalking," "programs providing legal, medical, or psychological counseling, for victims of domestic violence, dating violence, sexual assault, and stalking," the creation of "data collection and communication systems . . . linking campus security to the local law enforcement, and the distribution of "print or electronic materials to address both prevention and intervention in domestic violence, dating violence, sexual violence, and stalking." 42 U.S.C. § 14045b(b).

86. VAWA funding does not include policies or programs regulating access to restrooms or locker rooms.

87. DOJ's Letter to the University System indicates that DOJ believes that VAWA prohibits the University System and other educational institutions from maintaining sex-specific restrooms and locker rooms. Letter to the University System, *supra* note 3, at 2.

88. VAWA does not prohibit schools from maintaining sex-specific restrooms and locker rooms.

## II. The Harm to the Plaintiff's Members as a Result of DOJ's Letters

## A.     The Harm to the University Students

89.     The DOJ's threatened enforcement action, which has already commenced and includes an imminent threat to revoke the University System's $1.4 billion in federal funding, places the University Students at immediate risk of suffering the loss of educational opportunity as a result of decreased funding to the University System.

90.     The loss of such a substantial amount of money would result in severe cutbacks in educational programs from which the University Students directly benefit.

91.     This will directly harm University Students.

92.     Further, some of the University Students receive federal financial aid.

93.     These University Students rely on that federal financial assistance to attend schools in the University System.

94.     If DOJ revokes the University System's eligibility for federal funding, the University Students will no longer be eligible for federal financial assistance.

95.     Federal financial assistance under Title IX includes federal grants, loans, scholarships, and wages that are "authorized or extended under a law administered by the Federal agency that awards such assistance." *See* 65 Fed. Reg. 52858; *see also Grove City College v. Bell*, 465 U.S. 555, 569 (1984) (noting that enforcement action by the DOE against a college for failure to certify compliance

with Title IX would leave students receiving federal financial assistance the choice of switching colleges or foregoing the assistance).

96.    If DOJ follows through on its threat to imminently revoke federal funding from the University System due to a Title IX violation, that revocation would also bar students from using federal scholarships, loans, grants, and wages to pay for tuition to attend a college within the System.

97.    Students affected by a revocation of the University System's federal funding would have their expenditures related to their college costs increase dramatically, forcing them to pay far more to attend a college within the System, transfer to a school outside the System, or drop out of school altogether.

98.    The University System's colleges provide the highest quality college education available in North Carolina.

99.    If the University Students are barred from using federal funds to attend any college within the University System, they will have to attend colleges that provide inferior educational opportunities and degrees.

100.    If the University System capitulates to DOJ's threat, the University Students will suffer the loss of their constitutional right to privacy, because they will be compelled by the government to use restrooms and locker rooms with members of the opposite sex.

101.    The female University Students in particular object to the privacy violations created by allowing biological males the right of entry and use of restrooms and locker rooms designated for females.

18

102.   But the female University Students experience the added worry, anxiety, stress, and fear caused by the knowledge that allowing biological males the right of entry and use of restrooms and locker rooms designated for females places them at higher risk of sexual assault.

103.   The federal Center for Disease Control reports that "[i]n a nationally representative survey of adults, 37.4% of female rape victims were first raped between ages 18-24." Center for Disease Control, *Sexual Violence: Facts at a Glance* (2012), *available at* http://www.cdc.gov/violenceprevention/pdf/sv-datasheet-a.pdf (last visited May 8, 2016).

104.   The federal Center for Disease Control reports that, in a study limited to undergraduate college women, 19% experienced attempted or completed sexual assault *since entering college*." *Id.* (emphasis added).

105.   The President of the United States has stated that "[a]n estimated one in five women has been sexually assaulted during her college years."  The White House, "President Obama Launches the 'It's On Us' Campaign to End Sexual Assault on Campus," September 19, 2014, *available at* https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus (last visited May 8, 2016).

106.   The incidence of rape and other forms of sexual assault on college campuses may be even higher, because the President said that "only 12 percent [of sexual assaults] are reported." *Id.*

Case 1:16-cv-00845-TDS-JEP   Document 1   Filed 05/10/16   Page 19 of 50

107. Currently, if someone sees a male student enter the female students' private facilities, he or she can notify campus security.

108. But if Defendants have their way, no one will be able to stop any biological male from entering female restrooms and locker rooms.

109. Significantly, DOJ's and DOE's understanding of Title IX does not include a "gender expression" component, but only a "gender identity" component.

110. So, according to DOJ and DOE, biological males do not need to present as female in order to enter and use female restrooms and locker rooms; rather, they merely must say that they identify as female.

111. The female University Students are deeply concerned that male students whose gender identity matches their male biology might take advantage of such policies for nefarious and lewd purposes.

112. The female University Students are deeply concerned that allowing biological male students into their private facilities increases the likelihood that they will be assaulted or otherwise victimized.

113. Additionally, some of the University Students object to using restrooms and locker rooms with members of the opposite sex because of their sincerely held religious beliefs regarding modesty and nudity.

**B. The Harm to the Minor Students and their Parents**

114. The Minor Students all attend schools in North Carolina that receive federal funds pursuant to Title IX.

115.   Their schools, like all schools receiving federal funds, rely on those funds to provide numerous educational programs and activities.

116.   The DOJ and DOE are authorized to revoke federal funds of schools found to be in violation of Title IX.

117.   If the Minor Students' schools lose their federal funds, the Minor Students will suffer the harm of fewer, or inferior, educational programs and activities.

118.   Additionally, if the Minor Students' schools capitulate to DOJ's threat, the Minor Students will suffer the loss of their constitutional right to privacy, because they will be compelled by the government to use restrooms and locker rooms with members of the opposite sex.

119.   The Minor Students' Parents desire for their minor children to receive a high-quality public education.

120.   If the Minor Students' schools lose their federal funds, the Minor Students will suffer the harm of fewer, or inferior, educational programs and activities, and the Parents' desire for their minor children to receive a high-quality public education will be frustrated.

121.   If the Minor Students' schools capitulate to DOJ's threat, each Parent's right to direct the education and upbringing of their children—including their right to control whether their children will be exposed to people of the opposite sex in intimate, vulnerable settings like restrooms, locker rooms, and showers—will be

violated because their minor children will be compelled by the government to use restrooms and locker rooms with members of the opposite sex.

122. All of the Parents object to their children, the Minor Students, using restrooms and locker rooms with opposite-sex students, enduring the risk of exposure to opposite-sex nudity, and enduring the risk of exposing their own undressed or partially unclothed bodies to members of the opposite sex.

123. Additionally, some of the Minor Students and Parents object to the Minor Students using restrooms and locker rooms with members of the opposite sex because of their sincerely held religious beliefs regarding modesty and nudity.

## ALLEGATIONS OF LAW

124. If DOJ is allowed to forbid the State from maintaining sex-specific restrooms and locker rooms on its campuses, the University Students will either (1) suffer the loss of their constitutionally-guaranteed right to bodily privacy, or (2) suffer the loss of educational opportunities and their ability to access federal financial assistance, because the University System refuses to comply with DOJ's Ultimatum, and their schools' federal funds are revoked by the federal government.

125. If DOJ is allowed to forbid the State from maintaining sex-specific restrooms and locker rooms in its local school districts, the Minor Students will either (1) suffer the loss of their constitutionally-guaranteed right to bodily privacy, or (2) suffer the loss of educational opportunities because the State refuses to comply with DOJ's Ultimatum, and their schools' federal funds are revoked by the federal government.

126.   If DOJ is allowed to forbid the State from maintaining sex-specific restrooms and locker rooms in local school districts, the Parents will either (1) suffer the loss of their constitutionally-guaranteed right to direct the education and upbringing of their minor children, or (2) suffer the loss of educational opportunities for their children, because the State refuses to comply with DOJ's Ultimatum, and their schools' federal funds are revoked by the federal government.

127.   The University Students, Minor Students, and their Parents should not be forced to suffer any of these results, because providing single-sex restrooms, locker rooms, and shower facilities does not violate Title IX or VAWA, as DOJ's Ultimatum claims.

128.   To preserve the legal rights of the University Students, Minor Students, and Parents, North Carolinians for Privacy needs a declaration and injunction from this Court.

129.   North Carolinians for Privacy has no adequate remedy at law.

### FIRST CAUSE OF ACTION
### DECLARATION THAT DOJ AND DOE CANNOT RELY UPON DOE'S REDEFINION OF "SEX" IN TITLE IX BECAUSE THE REDEFINITION VIOLATES THE ADMINISTRATIVE PROCEDURE ACT[7]

130.   North Carolinians for Privacy realleges all matters set forth in paragraphs 1 through 129 and incorporate them herein.

---

[7] Plaintiff raises its federal constitutional and statutory arguments in the context of its APA claim, because presently the imminent harm to Plaintiff is DOJ's revocation of Title IX funding pursuant to the DOE's unlawful interpretation of Title IX. However, should the University System or other North Carolina school officials capitulate to the DOJ's demand and permit males into females' restrooms and changing areas, and vice versa, Plaintiff will amend the complaint to add those officials as defendants and assert separate constitutional and statutory claims against them.

Case 1:16-cv-00845-TDS-JEP   Document 1   Filed 05/10/16   Page 23 of 50

131.   DOE promulgated, and is enforcing, a new legislative rule that redefines the term "sex" in Title IX and its accompanying regulations to mean, or at least include, "gender identity."

132.   Pursuant to Executive Order 12250, the DOJ also has authority to bring enforcement actions to enforce Title IX.

133.   DOJ's enforcement of Title IX is reviewable pursuant to 20 U.S.C § 1683.

134.   Threatened adverse action pursuant to Title IX constitutes final, reviewable action.

135.   DOJ's letters, along with its lawsuit and the Attorney General's comments at her press conference, all threaten revocation of Title IX funding.

136.   Such threats of funding revocation are final, reviewable agency action.

137.   DOJ relied upon DOE's new rule redefining "sex" and, with its Ultimatum, is enforcing that rule against the State and the University System, and so against the University Students and the Minor Students and their Parents.

138.   DOJ's Ultimatum declares that Title IX requires educational institutions to permit students to use restrooms, locker rooms, and showers based on their gender identity, rather than their biological sex.

139.   DOJ's Ultimatum declares that Title IX prohibits educational institutions from maintaining sex-specific restrooms and locker rooms.

140.   DOJ's Ultimatum, if allowed to stand, would also prohibit educational institutions from maintaining sex-specific living facilities, which Title IX specifically authorizes. 20 U.S.C. § 1686.

141.   DOJ's reliance upon DOE's new rule is misplaced.

142.   DOE's new rule redefining "sex" in Title IX contradicts the text, structure, legislative history, and historical judicial interpretation of Title IX, all of which confirm that the term, "sex," means male and female in the binary and biological sense.

143.   According to DOE's new legislative rule, Title IX requires educational institutions to permit students to use restrooms, locker rooms, and showers based on their gender identity, rather than their biological sex.

144.   According to DOE's new legislative rule, Title IX prohibits educational institutions from maintaining sex-specific restrooms and locker rooms.

145.   DOE has communicated this new legislative rule to school districts and colleges nationwide and stated that their failure to comply with it will result in investigation and enforcement action up to and including withdrawal of billions of dollars in federal funding.

146.   DOE's promulgation and enforcement of this new legislative rule, which DOJ relies upon, are likewise reviewable actions under the Administrative Procedure Act ("APA").

147.   DOJ cannot rely upon DOE's new rule, and enforce it against the State and University, if DOE's new rule violates the APA and so is unlawful.

25

148. DOE's agency actions, including the creation of rules, are reviewable pursuant to 20 U.S.C § 1683.

149. DOE's new rule is a final, reviewable agency action, and there is no other adequate remedy, because DOJ now relies upon that rule to threaten the State and University System, which causes harm to the University Students, Minor Students, and Parents.

150. North Carolinians for Privacy cannot obtain relief unless this Court declares that DOE's actions are unlawful so that DOJ cannot rely upon them.

151. The members of North Carolinians for Privacy have suffered a legal wrong as a direct result of the DOE's agency action, upon which DOJ relies, because North Carolinians for Privacy's members' constitutional and statutory rights will be violated if the State and University System submit to DOJ's improper demand.

152. Under the APA, a reviewing Court must "hold unlawful and set aside agency action" in four instances that apply to this case:

• One: if the agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C);

• Two: if the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);

• Three: if the agency action is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); and

• Four: if the agency action is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

26

153.   DOE's promulgation of its new rule, upon which DOJ relies, violates all four of these standards and so should be held unlawful and set aside.

## A.  DOE's Action Is Unlawful Under the APA Because It Is In Excess of Statutory Jurisdiction, Authority, or Limitations

154.   DOE's actions in promulgating and enforcing its new rule are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because they redefine the unambiguous term "sex" and add gender identity to Title IX without the authorization of Congress.

155.   Congress has not delegated to DOE the authority to define, or redefine, unambiguous terms in Title IX.

156.   Title IX, passed in 1972, states that "[n]o person in the United States shall, on the basis of **_sex_**, be excluded from participation in, be denied the benefits of, or be subjected to discrimination…" 20 U.S.C. § 1681(a) (emphasis added).

157.   The term "sex" as used in Title IX means male and female, under the traditional binary conception of sex consistent with one's birth or biological sex.

158.   This definition is not ambiguous.

159.   Title IX makes no reference to "gender identity" in the language of the statute.

160.   The enacting regulations, which interpret Title IX and were promulgated in 1975, likewise make no reference to "gender identity."

161.   The legislative history of Title IX makes no reference to "gender identity."

27

162.   Title IX's implementing regulations are not ambiguous in their instruction that a school district may separate restrooms, locker rooms, and shower facilities on the basis of biological sex.

163.   Title IX permits schools receiving federal funds to "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686.

164.   The regulations implementing Title IX state that schools receiving federal funding "may provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

165.   Title IX does not require that the University System, or the State, open school restrooms, locker rooms and shower rooms to the opposite biological sex.

166.   DOE's unilateral decree that "sex" in Title IX includes "gender identity," which requires schools to allow males who identify as female to use the girls' facilities, and vice versa, requires is not supported by Title IX's text, implementing regulations, or legislative history.

167.   The new rule is contradicted by the fact that every court to consider the question for the past four decades, prior to the DOE's April 2015 Guidance Document equating sex discrimination with gender identity discrimination, had concluded that Title IX did not require cross-sex restrooms or locker rooms, even when students who identify as the opposite sex are involved.

168.     The new rule is contradicted by the fact that Congress has considered proposed legislation that would add Title IX style protections for gender identity discrimination, but has declined to enact it.

169.     Therefore, the DOE's rule was promulgated and enforced "in excess of statutory jurisdiction, authority or limitations, or short of statutory right[,]" *See* 5 U.S.C. § 706(2)(C).  This Court should hold that it is unlawful and set it aside.

170.     Additionally, DOE's rule would be unlawful if it were interpretive, instead of legislative, because it violates the Constitution and federal statutes, and is also plainly erroneous and inconsistent with Title IX itself.

### B.  DOE's Action Is Unlawful Under the APA Because It Is Arbitrary, Capricious, An Abuse of Discretion, or Not In Accordance With Law

171.     DOE's actions in promulgating and enforcing its new rule are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

172.     Congress requires that whenever an agency takes action it do so after engaging in a process by which it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n. v. State Farm Ins.*, 463 U.S. 29, 43 (1983) (quotation omitted).

173.     An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be

29

ascribed to a difference in view or product of agency expertise." *State Farm*, 463 U.S. at 43.

174. DOE gave no explanation whatsoever for its redefinition of "sex" in Title IX, whereby DOE unilaterally decreed that the term, "sex," in Title IX includes gender identity.

175. Nor did DOE give any explanation of the relevant factors that were the basis of its actions.

176. DOE failed to consider important aspects of the problems caused by mixing biological boys and girls in intimate settings, including the language and structure of Title IX and its regulations; the congressional, and judicial histories of Title IX and its regulations; the practical and constitutional harms created by its unlawful application of Title IX; and, the violation of Title IX caused by this unlawful application.

177. DOE's action was also made without a rational explanation.

178. It departed from the established Title IX policy that allowed schools to maintain private facilities separated by biological sex; and, it rested on considerations related to "gender identity," despite the fact that the legislative history indicates Congress did not intend "sex" to mean anything other than biological sex.

179. DOE's action was also made even though it is contrary to law or regulation.

180.   DOE's rule purporting to redefine Title IX violates Title IX as it applies to the very group Title IX was created to protect, female students, by creating a hostile environment for them.

181.   DOE's rule is thus contrary to Title IX.

182.   DOE's new rule is also contrary to the Religious Freedom Restoration Act ("RFRA"), codified at 42 U.S.C. §§ 2000bb et seq.

183.   Some of the University Students object to using restrooms and locker rooms with members of the opposite sex because of their sincerely held religious beliefs regarding modesty and nudity.

184.   Some of the Minor Students and Parents object to the Minor Students using restrooms and locker rooms with members of the opposite sex because of their sincerely held religious beliefs regarding modesty and nudity.

185.   Allowing opposite-sex students right of entry and use of restrooms and locker rooms will substantially burden these sincerely held religious beliefs.

186.   RFRA does not allow the government to substantially burden free exercise of religion unless the regulation satisfies strict scrutiny review, which requires that the government demonstrate that the law or regulation furthers a compelling interest in the least restrictive means available.

187.   DOJ and DOE have no compelling interest to justify forcing the University Students and the Minor Students to share restrooms and locker rooms with opposite sex persons.

188.    Also, DOJ and DOE have not used the least restrictive means of serving any interest they may have.

189.    Accordingly, DOE's new rule and DOJ's Ultimatum, which, if implemented, would prohibit the University System and those schools maintained by the State and its political subdivisions from retaining their sex-specific restrooms and locker rooms, fails the required strict scrutiny review and is unlawful under, and contrary to, RFRA.

190.    DOE's promulgation and enforcement of its rule is thus arbitrary, capricious, an abuse of discretion, and not in accordance with law. This Court should therefore hold that it is unlawful and set it aside.

191.    Additionally, DOE's rule would be unlawful if it were interpretive, instead of legislative, because it would still be arbitrary, capricious, an abuse of discretion, and not in accordance with law, and so is due to be declared unlawful and set aside.

## C. DOE's Action Is Unlawful Under the APA Because It Is Contrary to Constitutional Right, Power, Privilege, or Immunity

192.    DOE's actions are "contrary to constitutional right, power, privilege, or immunity." *See* 5 U.S.C. § 706(2)(B).

193.    DOE's legislative rule is an unlawful application of Title IX contrary to the Constitution because it violates numerous constitutional rights of the members of North Carolinians for Privacy, including the fundamental right to privacy; the fundamental liberty interest in directing the education and upbringing of one's children; and, the First Amendment's guarantee of free exercise of religion.

32

### 1. Privacy Rights Are Violated

194.    There is a fundamental constitutional right to bodily privacy in one's fully or partially unclothed body.

195.    This fundamental right also includes the right to be free from State-compelled risk of intimate exposure of oneself to the opposite sex.

196.    The right to be free from State-compelled risk of intimate exposure of oneself to the opposite sex, while part of the right to bodily privacy, is also separately and deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, and so is itself a fundamental constitutional right.

197.    Allowing opposite-sex students right of entry and use of restrooms and locker rooms will infringe the University Students' and the Minor Students' fundamental right to privacy in their unclothed bodies, as well as their fundamental right to be free from government-compelled risk of intimate exposure to the opposite sex, without any compelling justification.

198.    The government may not infringe fundamental rights, unless the infringement satisfies strict scrutiny review, which requires that the government demonstrate that the law or regulation furthers a compelling interest in the least restrictive means available.

199.    DOJ and DOE have no compelling interest to justify forcing the University Students and the Minor Students to share restrooms and locker rooms with opposite sex persons.

200. Also, DOJ and DOE have not used the least restrictive means of serving any interest they may have.

201. Accordingly, DOE's new rule and DOJ's Ultimatum, that the University System and those schools maintained by the State and its political subdivisions will face enforcement actions to revoke their federal funding if they retain their sex-specific restrooms and locker rooms, fails the required strict scrutiny review and is unconstitutional.

### 2. Fundamental Parental Rights Are Violated

202. The right of parents to make decisions concerning the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment's Due Process Clause.

203. Included within that parental fundamental right is the power to direct the education and upbringing of one's children.

204. This fundamental right gives parents the freedom, as well as the duty, to instill moral standards and values in their minor children.

205. This fundamental right encompasses the right to determine whether, and when, their minor children endure the risk of being in intimate, vulnerable settings like restrooms, locker rooms, and showers, with members of the opposite sex.

206. It also encompasses the right to determine whether their children will have to risk being exposed to opposite sex nudity at school and a fundamental right

34

to determine whether their children, while at school, will have to risk exposing their own undressed or partially unclothed bodies to members of the opposite sex.

207.    All of the Parents object to their children, the Minor Students, using restrooms and locker rooms with opposite-sex students, enduring the risk of exposure to opposite-sex nudity, and enduring the risk of exposing their own undressed or partially unclothed bodies to members of the opposite sex.

208.    Allowing opposite-sex students right of entry and use of restrooms and locker rooms will infringe this fundamental parental right.

209.    Defendants may not infringe fundamental rights, including parents' fundamental right to direct the education and upbringing of their children, unless the infringement satisfies strict scrutiny review.

210.    Defendants have no compelling interest to justify forcing school children to share restrooms and locker rooms with opposite sex classmates.

211.    Also, Defendants have not used the least restrictive means of serving any interest they may have.

212.    Accordingly, DOE's new rule and DOJ's Ultimatum, that those schools maintained by the State and its political subdivisions will face enforcement actions to revoke their federal funding if they retain their sex-specific restrooms and locker rooms, fails the required strict scrutiny review and is unconstitutional.

### 3. Free Exercise Rights Are Violated.

213.    The First Amendment provides that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

Case 1:16-cv-00845-TDS-JEP   Document 1   Filed 05/10/16   Page 35 of 50

214.    Some of the University Students object to using restrooms and locker rooms with members of the opposite sex because of their sincerely held religious beliefs regarding modesty and nudity.

215.    Some of the Minor Students and Parents object to the Minor Students using restrooms and locker rooms with members of the opposite sex because of their sincerely held religious beliefs regarding modesty and nudity.

216.    Allowing opposite-sex students right of entry and use of restrooms and locker rooms will infringe the free exercise rights of these University Students, Minor Students, and their Parents.

217.    Laws that burden free exercise, but are not neutral or generally applicable, are subject to strict scrutiny.

218.    DOE's new rule and DOJ's Ultimatum are not generally applicable because it does not allow all students to use the opposite-sex restrooms and locker rooms, but only students who perceive themselves as a different gender than their biological sex.

219.    Because the DOE's new rule and DOJ's Ultimatum are not generally applicable, it is subject to strict scrutiny.

220.    Additionally, DOE's new rule and DOJ's Ultimatum is subject to strict scrutiny because, in addition to burdening free exercise rights, it also burdens other constitutional rights.

221.    Defendants have no compelling interest to justify forcing school children to share restrooms and locker rooms with opposite sex classmates.

36

222.    Also, Defendants have not used the least restrictive means of serving any interest they may have.

223.    Accordingly, DOE's new rule and DOJ's Ultimatum, that those schools maintained by the State and its political subdivisions will face enforcement actions to revoke their federal funding if they retain their sex-specific restrooms and locker rooms, fails the required strict scrutiny review and is unconstitutional.

### 4. Spending Clause Requirements Are Violated

224.    Also, DOE's legislative rule is in violation of the Spending Clause of the United States Constitution, under which Title IX was enacted.

225.    When Congress uses its Spending Clause power, it generates legislation much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.

226.    Congress must clearly and unambiguously state the conditions to which the States are agreeing in exchange for federal funds, so that the States can knowingly decide whether to accept the funding.

227.    The crucial inquiry is whether Congress spoke so clearly that it can be fairly said that the State could make an informed choice.

228.    Requiring educational institutions to allow biological males access to facilities designated for females cannot pass this test, no matter how the males identify.

37

229. Requiring educational institutions to allow biological females access to facilities designated for males cannot pass this test, no matter how the females identify.

230. As already explained, the plain language of the text, along with the legislative history, clearly indicates that Congress intended that (1) "sex" means "biological sex;" (2) Title IX prevents discrimination based on biological sex; and (3) Title IX allows sex-specific restrooms, locker rooms, and living facilities.

231. Further, the implementing regulations specifically allow schools to maintain restrooms and locker rooms separated by biological sex.

232. Thus, for the over 40 years of Title IX's existence, it has been universally understood by schools that receive federal education funding that Title IX's definition of "sex" does not include gender identity.

233. It has likewise been universally understood by schools that received federal education funding that maintaining separate restrooms, locker rooms, and other private facilities on the basis of biological sex is consistent with Title IX.

234. No school could have possibly made an informed choice to accept federal funding because no school could have known that the funds it agreed to accept were conditioned on allowing cross-sex private facilities, or otherwise recognizing gender identity as encompassed within the meaning of "sex."

235. For these reasons, this Court should hold DOE's actions unlawful, set aside its guidance documents, and enjoin it, along with DOJ, from further communicating the new rule that "sex" in Title IX includes "gender identity" to any

38

schools, including the University System and those schools maintained by the State and its political subdivisions.

236.   Additionally, DOE's rule would be unlawful if it were interpretive, instead of legislative, because it would still be contrary to constitutional right, power, privilege, or immunity, and so is due to be declared unlawful and set aside.

### D.  DOE's Action Is Unlawful Under the APA Because It Is Without Observance of Procedure Required By Law

237.   DOE's actions were done "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

238.   As explained above, DOE has promulgated a new rule, unilaterally declaring that Title IX's term, "sex," includes "gender identity," and that Title IX thus prohibits discrimination based on gender identity.

239.   DOE's new rule, as enforced by DOJ, also requires schools, including the University System and those schools maintained by the State and its political subdivisions, to allow biological males entry and usage of restrooms and locker rooms designated for females, and vice versa.

240.   Further, DOJ has given this rule the full force of law, investigating and enforcing it against the University System and the State.

241.   Under the Administrative Procedure Act, any "rules which do not merely interpret existing law or announce tentative policy positions but which establish new policy positions that the agency treats as binding must comply with the APA's notice-and-comment requirements, regardless of how they initially are labeled." 72 Fed. Reg. 3433.

39

242. The Supreme Court has additionally ruled that all legislative rules, which are those having the force and effect of law and are accorded weight in agency adjudicatory processes, must go through the notice-and-comment requirements. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015).

243. Notice-and-comment rulemaking requires that the DOE (1) issue a general notice to the public of the proposed rule-making, typically by publishing notice in the Federal Register; (2) give interested parties an opportunity to submit written data, views, or arguments on the proposed rule, and consider and respond to significant comments received; and (3) include in the promulgation of the final rule a concise general statement of the rule's basis and purpose.

244. Notice-and-comment rulemaking also requires that the DOE consider all the relevant comments offered during the public comment period before finally deciding whether to adopt the proposed rule.

245. Additionally, under Title IX, final rules, regulations, and orders of general applicability issued by DOE must be approved by the president of the United States.

246. DOE promulgated and enforced its new rule redefining "sex" in Title IX to include gender identity without notice and comment as required by law. 5 U.S.C. § 553. It promulgated this new legislative rule without signature by the president as required by Title IX. 20 U.S.C. § 1682.

247. Simply stated, DOE did not follow the required procedure when it adopted its new rule defining "sex" in Title IX to mean, or include, gender identity.

40

248. Because DOE's rule violates the APA, this Court should declare that DOJ cannot lawfully rely upon it as authority for the meaning of "sex" in Title IX.

WHEREFORE, North Carolinians for Privacy respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## SECOND CAUSE OF ACTION
### DECLARATION THAT MAINTAINING SEX-SPECIFIC RESTROOMS AND LOCKER ROOMS DOES NOT VIOLATE TITLE IX

249. North Carolinians for Privacy realleges all matters set forth in paragraphs 1 through 248 and incorporate them herein.

250. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

251. Title IX itself refers to "both sexes," indicating binary, biological sex. 20 U.S.C. § 1681(a)(2).

252. Title IX also refers to "one sex" and "the other sex," indicating binary, biological sex. 20 U.S.C. § 1681(a)(8).

253. Title IX explicitly allows educational institutions to maintain "separate living facilities for the different sexes," indicating binary, biological sex. 20 U.S.C. § 1686.

254. Title IX's implementing regulations, found at 34 C.F.R. Part 106, contain many similar, "one sex . . . the other sex" statements, each referring to binary, biological sex.

41

255. Title IX's implementing regulations explicitly allow sex-specific restrooms and locker rooms.

256. The implementing regulations state that educational institutions may, consistent with Title IX, "provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of *one sex* [are] comparable to such facilities provided for students of *the other sex*." 34 C.F.R. § 106.33 (emphasis added).

257. "[O]ne sex" and "of the other sex" in 34 C.F.R. § 106.33 refers to binary, biological sex.

258. Accordingly, DOJ's Ultimatum, that the University System and those schools maintained by the State and its political subdivisions will imminently lose their federal funding if they retain their sex-specific restrooms and locker rooms, violates the guarantees of Title IX.

WHEREFORE, North Carolinians for Privacy respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

<u>**THIRD CAUSE OF ACTION**</u>
**DECLARATION THAT DOJ'S RELIANCE ON VAWA
AS AUTHORITY TO ISSUE ITS ULTIMATUM AND
VIOLATE PLAINTIFF'S RIGHTS IS MISPLACED**

259. North Carolinians for Privacy realleges all matters set forth in paragraphs 1 through 258 and incorporate them herein.

260. DOJ states in its Letter to the University System that VAWA requires the University System to allow biological males right of entry and use of facilities designated for females, and vice versa.

42

261. VAWA requires nothing of the sort.

262. VAWA requires that no one "be excluded from participation in, be denied the benefits of, or be subjected to discrimination *under any program or activity funded in whole or in part with funds made available under the [VAWA]*." 42 U.S.C.A. § 13925(13)(A) (emphasis added).

263. The programs and activities funded under VAWA include, for example, "education programs for the prevention of domestic violence, dating violence, sexual assault, and stalking," "programs providing legal, medical, or psychological counseling, for victims of domestic violence, dating violence, sexual assault, and stalking," the creation of "data collection and communication systems . . . linking campus security to the local law enforcement, and the distribution of "print or electronic materials to address both prevention and intervention in domestic violence, dating violence, sexual violence, and stalking." 42 U.S.C. § 14045b(b).

264. VAWA funding does not specifically include policies or programs regulating access to bathrooms.

265. Thus, VAWA is inapposite, and DOJ's reliance upon it for its Ultimatum to the University System is misplaced.

266. Additionally, similar to Title IX, VAWA has an express carve-out for "sex segregation" and "sex-specific programming" that "is necessary to the essential operation of a program." 42 U.S.C.A. § 13925(13)(B).

267. The statute provides in relevant part, "If sex segregation or sex-specific programming is necessary to the essential operation of a program, nothing in this

paragraph shall prevent any such program or activity from consideration of an individual's sex." *Id.* It continues: "In such circumstances, grantees may meet the requirements of this paragraph by providing comparable services to individuals who cannot be provided with the sex-segregated or sex-specific programming." *Id.*

268. Because of constitutional privacy and free exercise concerns, separation by biological sex is "necessary to the essential operation" of the University System's restrooms and locker rooms.

269. Because of statutory Title IX and RFRA concern, separation by biological sex is "necessary to the essential operation" of the University System's restrooms and locker rooms.

270. Because of safety concerns, separation by biological sex is "necessary to the essential operation" of the University System's restrooms and locker rooms.

271. These same concerns undergird the need for the State and its political subdivisions to be able to provide sex-specific restrooms and locker rooms in its schools.

272. Because separation by biological sex is necessary to the essential operation of the University System's restrooms and locker rooms, and because VAWA therefore allows such separation, DOJ's reliance upon VAWA for its Ultimatum to the University System is misplaced.

273. Additionally, the University System's practice of maintaining restrooms and locker rooms separated by biological sex does not discriminate based on gender identity.

44

274. The University System forbids _all_ biological males, regardless of their gender identity, from using restrooms or locker rooms designated for females.

275. The University System similarly forbids _all_ biological females, regardless of their gender identity, from using restrooms or locker rooms designated for males.

276. The University System therefore does not discriminate based on gender identity, but treats all biological males the same, and all biological females the same.

277. Ironically, DOJ's Ultimatum to the University System would require the University to engage in gender-identity discrimination.

278. DOJ's Ultimatum seeks to compel the University System to allow _some, but not all_, biological males the right of entry and use of female restrooms and locker rooms.

279. The determining factor between the males who would be allowed such right of entry and use, and those who would be denied it, is their gender identity.

280. Similarly, DOJ's Ultimatum seeks to compel the University System to allow _some, but not all_, biological females the right of entry and use of male restrooms and locker rooms.

281. The determining factor between the females who would be allowed such right of entry and use, and those who would be denied it, is their gender identity.

45

282. So, under DOJ's Ultimatum, those biological males whose gender identity is female would be allowed access to the female restrooms and locker rooms, but those biological males whose gender identity is male would be denied such access.

283. And, under DOJ's Ultimatum, those biological females whose gender identity is male would be allowed access to the male restrooms and locker rooms, but those biological females whose gender identity is female would be denied such access.

284. The result just described would be impermissible discrimination on the basis of gender identity, because it would make a biological male student's gender identity the determining factor for whether he could access the female facilities, and vice versa.

285. The University System's policy, which forbids _all_ biological males from entering and using the female facilities, regardless of the biological males' gender identity, and forbids _all_ biological females from entering and using the male facilities, regardless gender identity, does not engage in gender identity discrimination, but rather treats all persons the same, regardless of their gender identity.

286. Thus, VAWA is inapposite, and DOJ's reliance upon it for its Ultimatum to the University System is misplaced.

287. Additionally, the definition of gender identity that VAWA incorporates is found in the federal "hate crimes act."

46

288.   The hate crimes act is concerned with people attacking a victim because the victim's dress or hair style does not conform to what people typically associate with the victim's sex.

289.   In other words, the hate crimes act is concerned with gender identity in the sense of *gender stereotyping* (i.e., when a man is attacked because he is not masculine enough, or a woman is attacked because she is not feminine enough).

290.   "Gender identity" in the hate crimes act does not contemplate situations where one does not perceive himself as being his biological sex.

291.   Accordingly, DOJ's interpretation of VAWA is not required by the hate crimes act.

292.   Neither the hate crimes act nor VAWA require the University System or the State to allow students to use opposite-sex restrooms and locker rooms.

293.   Neither the hate crimes act nor VAWA forbid the University System or the State from maintaining sex-specific restrooms and locker rooms.

294.   Thus, VAWA is inapposite, and DOJ's reliance upon it for its Ultimatum to the State and the University System is misplaced.

WHEREFORE, North Carolinians for Privacy respectfully prays that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, North Carolinians for Privacy respectfully prays for judgment as follows and requests the following relief:

47

A.      That this Court declare that the Department of Education's new rule, that redefines the word "sex" in Title IX to mean, or include, gender identity, and upon which the Department of Justice relies in issuing its Ultimatum to the State and University, violates the provisions and requirements of the Administrative Procedure Act and so is unlawful and unenforceable, by the Department of Education as well as the Department of Justice; and, that this Court declare that the Department of Justice and the Department of Education cannot rely upon an unlawful rule for purposes of determining the requirements of Title IX (Count I);

B.      That this Court declare that Title IX does not require educational institutions to allow biological males the right of entry and use of female restrooms and locker rooms, and vice versa, but rather allows such institutions to maintain sex-specific facilities (Count II);

C.      That this Court declare that the Violence Against Women Act does not require educational institutions to allow biological males the right of entry and use of female restrooms and locker rooms, and vice versa, but rather allows such institutions to maintain sex-specific facilities (Count III);

D.      That this Court enter a preliminary and permanent injunction restraining Defendants, their officers, agents, employees, and all other persons acting in concert with them, from taking any action contrary to this Court's Declarations, including the threatened revocation of federal funding made available to the University System and the State's schools;

E.      That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders;

F.      That this Court award North Carolinians for Privacy costs and expenses of this action, including a reasonable attorneys' fees award, in accordance with 28 U.S.C. § 2412;

G.      That this Court issue the requested injunctive relief without a condition of bond or other security being required of North Carolinians for Privacy; and

H.      That this Court grant such other and further relief as the Court deems equitable and just in the circumstances.

Respectfully submitted this 10th day of May, 2016.

JEREMY D. TEDESCO, AZ 023497*
JAMES A. CAMPBELL, AZ 026737*
KRISTEN WAGGONER, AZ 032382*
JOSEPH E. LARUE, AZ 031348*
JONATHAN CALEB DALTON, AZ 030539*
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th St.
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
kwaggoner@adflegal.org
jtedesco@adflegal.org
jcampbell@adflegal.org
jlarue@adflegal.org
cdalton@adflegal.org

DAVID A. CORTMAN, GA 188810*
J. MATTHEW SHARP, GA 607842*
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road NE
Suite D-1100

By: /s/ Deborah J. Dewart
    DEBORAH J. DEWART, NC Bar 30602
    Liberty, Life, and Law Foundation
    620 E. Sabiston Drive
    Swansboro, NC 28584-9674
    910-326-4554
    877-326-4585 Fax
    debcpalaw@earthlink.net

    *Local Civil Rule 83.1 Counsel for
    North Carolinians for Privacy*

49

Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
dcortman@adflegal.org
msharp@adflegal.org

*Counsel for North Carolinians for
Privacy*

***Pro Hac Vice Applications Forthcoming**

THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED